NEW ORLEANS. v. GARLAND.

~~~

THE STATE OF LOUISIANA, on the relation of JOHN HOLMES, v. EMILE WILTZ.

An interpretation of a statute which must lead to consequences mischievious and absurd is inadmissible, if the statute is susceptible of another interpretation whereby such consequences may be avoided. The legislative intention must be honestly sought after and faithfully executed, if not in conflict with a paramount law. And in cases like this, the meaning must be sought, not merely in the words of the statute itself, but in its subject matter, in the history of the legislation thereupon, in the purpose of the law, the reason of its enactment, and the evil it sought to remedy.

The subject matter of the Act of 14th March, 1855, ("an Act creating a Recorder of Mortgages for the parish of Orleans,") is not the erection of a new office   It seems to imply the recognition of an existing office, whose duties are well known. It does not purport to extinguish that office, and to substitute a new and different one. It provides for the mode of appointing an incumbent to fill it at stated intervals, for the mode of giving his bond, and for the appointment of his deputy, whose duties are to be commensurate with his own, but for whose acts he and his sureties are to be responsible. All these sections relate to the officer, not to the office; the office exists independent of the statute; and these simple provisions about the incumbent constitute its whole subject matter.

The statute in question is in fact but a grouping together in one act of parts of three pre-existing laws, with very slight changes of phraseology, and no change whatever of substance. By it the Legislature has merely said " here is a condensed statement of all the law now in force relative to the mode of appointment, term of service, amount and condition of the bond, and appointment, duties of and responsibility for a deputy, of the Recorder of Mortgages for the parish of Orleans: all else, *upon these specified matters*, is repealed."

It cannot fairly be inferred that an ancient office was thereby abolished, and a new one created. The literal terms of the statute do not seem to require such a construction; its history, subject matter and purpose alike forbid it.

A person holding an existing office under a fixed tenure cannot be removed, or his regular term of service abridged by an ordinary act of legislation, other than an Act abolishing the office. *The mode of removing officers is prescribed by the Constitution.*

While the history of the legislation, and the circumstances under which the statute was enacted may be inquired into, as furnishing aids to its interpretation, still the plain and unequivocal meaning, according to its received acceptation, of the language in which an Act is expressed, should not be overlooked. LEA, J., dissenting.

Under the Constitution unless the object of a law is expressed in its title, the law is absolutely void; indeed nothing else can be lawfully included in it ; if therefore, the object or intention of the lawgiver is not made clear by the other parts of the Act, it must be determined with absolute certainty by a reference to its title. LEA, J., dissenting.

The object of the statute in question is *expressed in its title :* that title is "an Act *creating* a Recorder of Mortgages for the parish of Orleans." The statute created anew the office of Recorder of Mortgages, and authorized the appointment of a new officer. LEA, J., dissenting.

APPEAL from the Fourth District Court of New Orleans, *Reynolds*, J. *Lacy & Wooldridge* and *Moïse & W. M. Randolph*, for plaintiff. *Ogden & Leovy*, for defendant and appellant.

STATE
*v.*
WILTZ.

SPOFFORD, J. (LEA, J., dissenting.) The defendant, holding a commission from the late Governor, as Recorder of Mortgages for the parish of Orleans, for two years from the 1st day of March, 1855, has appealed from a judgment ordering him, by peremptory mandamus, to register the bond, and recognize the capacity of the relator, *Holmes*, who was commissioned by the present Governor on the 15th March, 1856, as "Recorder of Mortgages for the parish of Orleans, *vice Emile Wiltz*, whose term of office has expired by the provisions of an Act entitled "an Act creating a Recorder of Mortgages for the parish of Orleans," approved March 14th, 1855. The judgment appealed from also condemns the defendant to deliver all the archives of the office of Recorder of Mortgages in his possession to the relator, and to pay the costs of these proceedings.

The relator has moved to dismiss the appeal; the matter in dispute is shown by affidavit to exceed three hundred dollars, and the case is within our appellate jurisdiction.

The controversy turns principally upon the construction of the repealing section of the "Act creating a Recorder of Mortgages for the parish of Orleans," approved March 14th, 1855. (Session Acts, p. 321.) Section four declares "that all laws contrary to the provisions of this Act, and all laws on the same subject matter, except what is contained in the Civil Code and Code of Practice, be repealed."

The relator contends that, therefore, the statute of March 14th, 1855, abolished the office of Recorder of Mortgages for the city and parish of New Orleans, which had existed at least ever since the 20th March, 1813, (Session Acts, p. 136,) and created a new, distinct and independent office, which has never been filled until the relator was appointed as its first incumbent on the 15th March, 1856.

If this be true, the judgment is clearly wrong in decreeing the defendant to deliver the archives of his extinct office to the incumbent of a new and different office, without any warrant of law. For the Act of March 14th, 1855, upon which the relator bases all his pretensions, insisting that we must shut our eyes to everything else in our voluminous statute books, has declared what shall be done with the important and valuable documents belonging to the office said to have been abolished. If the statute has created a new office, it has left the first incumbent to enter upon a new career, unembarrassed by the custody of ancient records, but with faint lights to guide him.

The first section declares "that the Governor shall nominate and, by and with the advice and consent of the Senate, appoint a Recorder of Mortgages for the parish of Orleans, who shall hold his office for two years, and until his successor shall be duly appointed and qualified."

"Sec. 2. That he shall furnish to the Governor of the State his bond, with one or more securities, to the amount of forty thousand dollars, for the faithful execution of the duties required of him by law, and for the payment of such damages as may be sustained by his failure to discharge such duties.

"Sec. 3. That he is authorized and empowered to appoint a deputy, whose duties shall be the same as those of said Recorders; provided, that he and his sureties shall be responsible for the official acts of said deputy." Then follows the repealing section already quoted, and this is all.

An interpretation which must lead to consequences both mischievous and absurd is inadmissible, if the statute is susceptible of another interpretation

whereby such consequences may be avoided. The legislative intention must be honestly sought after and faithfully executed, if not in conflict with a paramount law. And, in cases like the present, we are authorized to search for that meaning, not merely in the words of the statute itself, but in the subject matter, in the history of the legislation thereupon, in the purpose of the new law, the reason of its enactment, and the evil it sought to remedy. *Ardry* v. *Ardry*, 16 L., 268; *Cox* v. *Williams*, 5 N. S., 140; *Commercial Bank* v. *Foster*, 5 An., 516.

The subject matter of the law, then, is not the erection of a new office. Indeed, it seems to imply the recognition of an existing office, whose duties were well known. It does not purport to extinguish that office and to substitute a new and different one. It provides for the mode of appointing an incumbent to fill it at stated intervals, for the mode of giving his bond, and for the appointment of his deputy, whose duties are to be commensurate with his own, but for whose acts he and his sureties are to be responsible. All these sections relate to the officer, not to the office; the office exists independent of the statute; and these simple provisions about the incumbent constitute its whole subject matter.

But the repealing clause is relied upon as accomplishing a great deal more than the statute would have done otherwise.

We take notice that, during the session of 1855, one hundred and forty other Acts were passed with the same repealing section.

These Acts were adopted in pursuance of a system inaugurated at the preceding session of the same General Assembly.

On the 15th March, 1854, was approved the "Act to provide for the revision of the statutes of the State of a general character," whereby a legislative committee was appointed "to revise the statutes of the State of a general character, to simplify their language, to correct their incongruities, to supply their deficiencies, to arrange them in order, and to reduce them to one connected text, with a view to their adoption as the Revised Statutes of the State." (Session Acts, p. 57.)

This committee proceeded with more than the usual celerity of codifiers, and the work was prepared in season for the next session. But an obstacle to its adoption as a whole was found in Art. 117 of the Constitution : "The Legislature shall never adopt any system or code of laws by general reference to such system or code of laws, but in all cases shall specify the several provisions of the laws it may enact." To evade this obstacle, it was proposed to pass the Revised Statutes in detail, with a sweeping repealing clause at the end of each; and, like evasions in general, this seems to have been productive of unforeseen troubles.

But, by this change, the Legislature did not, as contended by the relator's counsel, abandon their original purpose of " revising " the statutes; this is manifest from their own declaration in the " Act to regulate and define the duties of the commissioner appointed to revise the statutes of the State, and to fix his compensation" approved March 15th, 1855, (p. 212). That statute provided that the person selected by the joint committee of the two houses " to revise the statutes of the State under their supervision and direction, be continued in his functions until the final *completion and adoption* of the "Revised Statutes" by the General Assembly and their publication."

It provided further " that it shall be his duty *after their adoption and enactment*

56

by the General Assembly, to compile them into a book, to be called the "Revised Statutes of Louisiana," with marginal notes, table of contents and index, *similar to the work reported to the Legislature.*"

These matters of history may aid us in arriving at the true meaning of the last section of the statute before us. For we find that the statute contains nothing that is original, except this repealing section.

As already remarked, it introduced no new office unknown to the law before. In fact, it is but a grouping together, in one statute, of parts of three pre-existing laws, with very slight changes of phraseology, and no change whatever of substance.

The first section is taken from the Act of March 20th, 1813, p. 136; the second from the Article 3358 of the Civil Code, and the third from the Act of March 7th, 1843, p. 29.

The duties of the office are not described, and therefore do not enter into the "subject matter;" they are left as they stood before. The original of this office is to be found in the code of 1808, p. 464. The Register of Mortgages at New Orleans was Register for the whole Territory. His duties were prescribed in the old code. By the Act of March 24th, 1810, sec. 25, Sess. Acts, p. —, the duties of this register at New Orleans were reduced almost to those of a register for the county of Orleans merely, the Parish Judges of the parishes where mortgaged property was situated being made recorders of mortgages for their respective parishes.

By the Act of 20th March, 1813, the term of the incumbent and the mode of appointing him were declared, but no change was made in the nature of the offices. The same term and the same mode of appointment have been re-declared in the Act of 14th March, 1855, and still no change is made in the office itself or its duties.

By the present code adopted in 1825 (and which is specially reserved as still in force by the repealing clause under consideration) the same office is recognized as then existing, and the duties thereof more distinctly defined than before.

"Art. 3349. There *is established* in each parish an office for the recording of mortgages, privileges and donations."

"Art. 3350. This office *is kept* in the parish of Orleans by a particular officer called the Recorder of Mortgages."

"Art. 3351 et seq. describe the duties of the Recorder of Mortgages for the parish of Orleans.

Art. 3521 of this code constitutes a repealing clause as extensive as the one annexed to the statute under consideration.

It has not been suggested that the code of 1825, which treats directly of the office itself, extinguished the old office and established a new one.

On the 7th March, 1843, the Act authorizing the appointment of a deputy to the Recorder of Mortgages for the city and parish of New Orleans was passed in the identical terms preserved in the 3d section of the Act of March 14th, 1855.

This review of the pre-existing legislation relative both to the office and the officer, may also contribute to elucidate the meaning and intent of the Act in question.

By this statute we think the Legislature has merely said: "here is a condensed statement of all the law now in force relative to the mode of appoint-

ment, term of service, amount and conditions of the bond, and appointment, duties of, and responsibility for a deputy, of the Recorder of Mortgages for the parish of Orleans; all else, *upon these specified matters*, is repealed."

We cannot fairly infer that an ancient office was thereby abolished and a new one created. The literal terms of the statute do not seem to require such a construction; its history, subject-matter and purpose alike forbid it.

If the office to which *Emile Wiltz* was duly appointed for a term of two years, from the 1st of March, 1855, has not been abolished, there was no vacancy when the relator was appointed to it, nor is there yet.

For, it is inadmissible to say that a person holding an existing office, under a fixed tenure, can be removed, or that his regular term of service can be abridged, by an ordinary act of legislation other than an Act abolishing the office. The mode of removing officers is prescribed by the Constitution.

It is therefore ordered that the judgment of the District Court be avoided and reversed, that the petition for a mandamus be dismissed, and that the relator pay costs in both courts.

MERRICK, C. J. I concur with Mr. Justice SPOFFORD. It may also be remarked that the Article of the Civil Code cited by him, 2358, and which is the second section of the Act of 1855, is in these words, viz:

" The Register of Mortgages for the parish of Orleans shall furnish the Governor of the State one or more sureties, to the amount of forty thousand dollars, for the faithful execution of the duties required of him by law, and for the payment of such damages as may be sustained by his failure to discharge such duties."

This Article, as well as all other Articles in the Civil Code on the subject of registry, are expressly exempted from repeal. The defendant, *Wiltz*, had given his bond in conformity to this Article of the code which is expressly recognized by the Act of 1855 as being in force. Now, the office having been continued, nothing short of an express declaration to that effect ought, in legislation merely revisionary, to be deemed sufficient to remove the incumbent.

LEA, J., dissenting. In March, 1855, an Act of the Legislature was approved having the following title : " An Act creating a Recorder of Mortgages for the parish of Orleans." By the first section of this Act it was enacted " that the Governor shall nominate, and by and with the advice and consent of the Senate, shall appoint a Recorder of Mortgages for the parish of Orleans, who shall hold his office for two years and until his successor shall be duly appointed and qualified."

In accordance with the instructions contained in this section, the Governor *did* nominate, and by and with the advice and consent of the Senate, appointed a Recorder of Mortgages, investing him with a commission authorizing him to hold the office from and after the date thereof. By virtue of the commission thus given to him, the relator, *John Holmes*, claims to be put in possession of the records, documents, books, papers and effects appertaining to said office of Recorder of Mortgages.

For answer to this demand, *Emile Wiltz*, the defendant, avers that he is the Recorder of Mortgages of the parish of Orleans, holding the office under a commission from Governor Hebert bearing date of the 1st March, 1855; that said commission was issued to him in strict conformity with the Constitution and laws of the State of Louisiana, and that by virtue of said appointment and commission, and by the laws under which it was given, he is entitled to hold the

office for the space of two years from the date thereof, to wit, until the 1st March, 1857.   In other words, the defendant contends that the law under which he was appointed, never having been repealed, he is entitled to hold the office according to the tenor of his commission.

In the argument of the case at bar, questions have been presented affecting the interpretation of nearly all the revisory legislation of 1855; questions which are environed with difficulties which scarcely any rule of interpretation can reconcile, but which, it appears to me, the issue presented imposes upon us the necessity of solving only in part.

For the purpose of determining the issue between the parties, it is only necessary to inquire whether a new office has been created? and if so, whether the previous legislation inconsistent with the creation of such new office has been repealed?   It is urged that the statute which is the subject of interpretation and which is entitled " *An Act creating a Recorder of Mortgages for the parish of Orleans,*" did not in fact create and was not intended to create such an officer; that the section which instructs the Governor to nominate, and by and with the advice and consent of the Senate to appoint a Recorder of Mortgages, does not authorize, and was not intended to authorize him to make such appointment except in accordance with the provisions of previously existing statutes; and that the section which provides " that all laws contrary to the provisions of the Act in question, and all laws on the same subject matter, except such as are contained in the Civil Code and Code of Practice are repealed," in fact repealed none of them, but left the previous legislation precisely where it was before the passage of the Act, which is but a mere compilation of previous statutes having in itself no inherent vitality.   This is not the language adopted in the arguments of counsel, but this (as it appears to me) is a correct statement of the conclusion to which it leads.   If *Wiltz* is entitled to retain the office, then it is clear (and indeed it is so argued) that the statute of 1855 did not create a new office, did not authorize the Governor to make a new appointment, and did not repeal the previous legislation on the subject.

Now, I fully concede the correctness of those rules of interpretation which have been so concisely and clearly laid down in the opinion of the majority of the court.   I think we may, and should look beyond the Act which is the subject matter of interpretation, for the purpose of ascertaining its meaning; that we should notice the fact that 140 Acts of a revisory character were passed during the session of the Legislature in 1855, and that it is proper that we should look to the history of the legislation which led to the enactment of these revisory statutes; more especially do I concur with my colleagues that any construction of these statutes which would lead to consequences both mischievous and absurd, should, if possible, be avoided; and whatever may have been the inadvertencies of legislation, it may be assumed that the Legislature did not intend to produce a state of anarchy: and where this would be the necessary result of a particular construction of a statute, the court will endeavor to find some other meaning not inconsistent with sound rules of interpretation; but even then, no mere inconvenience, however great, nor even any supposed public necessity could justify the court in ignoring the palpable force and meaning of language.   It would involve a departure from its constitutional sphere, and an invasion of that appertaining to an independent and co-ordinate department of the government.

The history of the legislation which led to the enactment of the statutes of

1855 is substantially as follows: In 1854, the Legislature passed an Act entitled "*An Act to provide for the revision of the statutes of the State,*" the preamble of which is in the following words, "Whereas it is a matter of great public importance that the public statutes of this State should be revised, their language simplified, their incongruities corrected, their deficiencies supplied, and the whole arranged in order and reduced to one connected text, with a view to their adoption as the revised statutes of this State, to the end that all may know he law, therefore," &c. The first section provides for the appointment of a committee of revision. The second section provides that "said committee shall select some suitable person, whose duty it shall be, under the supervision and direction of said committee, to revise the statutes of the State of a general character, to simplify their language, to correct their incongruities, to supply their deficiencies, to arrange them in order, and to reduce them to one connected text, with a view to their adoption as the 'Revised Statutes' of the State." The other sections of the Act refer merely to details for carrying out the work.

Now, it is evident that when this Act was passed, it was the intention of the Legislature, not to authorize the compilation of a mere digest of the laws of the State, but to adopt a body of laws under the general head of "Revised Statutes." It became manifest, however, that this plan was open to objections, as being in contravention of the 115th and 117th Articles of the Constitution. Being unwilling to authorize a mere digest of the laws, and being prohibited from adopting a compilation of revised statutes, they resorted to the plan of selecting separate and independent subjects of legislation, each of which should be the subject matter of a distinct statute which should embrace such of the provisions of antecedent statutes on the same subject as they might think proper to retain; and when the entire legislation upon a single subject matter was thus condensed, it appears to have been the intention that no reference should be made to previous statutes for the purpose of ascertaining the law;—hence the repealing clause. Both in form and in fact, the several statutes were separate and independent Acts of legislation. Among these statutes thus enacted is that upon the interpretation of which depend the rights of the parties in this litigation.

Approaching then the solution of the issue between the parties with a reference to the history of the whole legislation out of which it springs, and with a view solely to a recognition of the intention of the Legislature in the enactment of the statute referred to, as ascertained by those rules of interpretation which obtain in all countries having a fixed jurisprudence, the questions to be determined are :—Did the Legislature intend to create a new office? Did they intend to authorize the appointment of a new officer? Did they intend to repeal all previous legislation on the same subject matter and substitute the new statute in its place? Now, although I have freely conceded the propriety of looking to the history of legislation and to the circumstances under which it is enacted, as furnishing aids to its interpretation, I must still insist that the plain and unequivocal meaning (according to its received acceptation) of the language in which an Act is expressed, should not be overlooked. In the interpretation of that part of the legislation of Louisiana enacted since the adoption of the Constitution of 1845, we are furnished with a constitutional guide which, I believe, is peculiar to our State. Owing to the chaotic character of the legislation prior to that period, and owing to the fact that the title of a law often afforded no indication of its contents, it was, for the express purpose of determining with certainty the objects of legislation, adopted into the fundamental law of the

State that "every law shall embrace but one object, and that shall be expressed in the title." Constitution, Art. 115. Unless, therefore, the object of a law is expressed in the title, it is absolutely void; indeed, nothing else can be lawfully included with it. If, therefore, the object or intention of the lawgiver is not made clear by the other parts of an Act, it must be determined with absolute certainty by a reference to the title. Now, the issue between the parties in this case is, whether a new office was or was not created by the statute under which the relator was appointed. If the object of the statute was to create anew the office of Recorder of Mortgages by new legislation, which should be a substitute for that which they intended to repeal, then the relator, as it appears to me, is clearly entitled to a judgment in his favor. If the object was merely to recognize an office already created by legislation which has not been repealed, but which is still in force, then it is equally clear that the judgment should be against him : but the designation of the object of the Act as "*it is expressed in the title*," is, as has been before stated, "An Act *creating* a Recorder of Mortgages for the parish of Orleans." It appears to me that this is a constitutional solution of the issue. Pursuant to this declared object, the first section instructs the Governor to make the appointment; and the last section repeals all Acts *contrary* to the provisions of this Act and all laws on the same subject matter, except such as are contained in the Civil Code and Code of Practice.

But putting the statute itself entirely out of consideration, as if it had never been passed, let us suppose that the Legislature was now about to pass an Act for the express purpose of "*creating a Recorder of Mortgages for the parish of Orleans*," and for the purpose of instructing the Governor to appoint an incumbent to the office thus created, and for the further purpose of repealing the previous legislation on the subject so as to leave no such laws in force, what language could they adopt for the purpose of giving expression to their intentions ? If the language in which the statute under consideration is expressed fails to convey that meaning, I think it would be difficult to select such as would convey it.

Had the new statutes of 1855 been merely revisory, it might be questionable whether, as independent and separate statutes, in the absence of any repealing clause, they would not have operated as a repeal of the statutes which were the subject of revision; for the doctrine appears to be supported by authority, that "a subsequent statute revising the whole subject matter of a former one, and evidently intended as a substitute for it, *although it contains no express words to that effect,* must, on principles of law as well as of reason, operate to repeal the former." See Smith's Commentary on Statutory construction, § 786.

Such appears to have been the interpretation of similar statutes in Great Britain, even in civil matters. The first section of the statute 6, Geo. 4th, simply repealed all previous statutes of bankruptcy. There being no saving clause as to acts, of bankruptcy committed, or any inchoate proceedings under the former acts, it was held that the court had no power to imply a saving clause, although it was plain that by a mere inadvertence in legislation, the kingdom was left destitute of its bankrupt law. The court was pressed for a construction which might avert so general an evil; but *Lord Tenterden* said, "We are not at liberty to break in upon the general rule," though he admitted that it was very unfortunate that an Act of so much importance had been framed with so little care." Smith's Commentary, § 765.

It is not necessary, however, in this case to determine what may be the full

extent and effect of the repealing clause. The statute I think creates the office of Recorder of Mortgages as a substitute for the former office, and authorizes the appointment of a new officer. The further continuance in office of the former officer is inconsistent with the new legislation, the new office being a *substitute* for the old one, the archives and other muniments of office appertaining to the latter would belong of right to the new officer.

These views are the result of my examination of the particular statute which is subject of interpretation in this case and of the history of the legislation which led to its enactment; but I am not unwilling to concede that where it is *manifest* from the context of the new statute that a substitution of the new legislation in the place of previous and similar provisions on the same subject was *not intended*, the repealing clause should be to that extent restricted in its application; but such a departure from the ordinary rules of interpretation should be confined to cases where the terms of the statute itself necessarily demand it, in order to give effect to the whole statute; on the ground that an Act should be so construed as, if possible, to give effect to all its parts. The Act now under consideration is not of that character.

I think the judgment should be affirmed.